SIMON, Respondent, v. WESENBERG and another, Appellants. WESENBERG, Appellant, v. SIMON, Respondent.

*April 7—May 5, 1959.*

222

For the appellants there was a brief by *John P. Mc-Galloway, Sr.,* and oral argument by *William D. McGalloway,* both of Fond du Lac.

For the respondent there was a brief by *St. Peter & Hauer,* attorneys, and *Albert J. Hauer* of counsel, all of Fond du Lac, and oral argument by *Albert J. Hauer.*

CURRIE, J. The issues on this appeal are:

(1) Is there credible evidence to sustain the jury's findings that Mrs. Wesenberg was causally negligent as to both lookout and management and control?

(2) Was Simon guilty of causal negligence as a matter of law with respect to lookout, speed, or management and control?

(3) Is there credible evidence to sustain the jury apportionment of negligence between the two drivers?

We consider that the issues raised are essentially factual and not legal in scope. This necessitates a careful analysis of the testimony and evidence which tend to support the special verdict.

The accident occurred at about 1:30 a. m. on April 23, 1957, on U. S. Highway 41 in Fond du Lac county some distance north of the intersection of such highway with Highway 23. At such point Highway 41 runs in a northerly and southerly direction and has a concrete pavement 24 feet wide. Such highway is straight and level for a considerable distance to the north and south of the point at which the accident occurred.

Simon at the time resided in Milwaukee and on Saturday, April 21, 1957, had driven to Green Bay to spend the week end at the home of his mother, Easter being the next day. At the time of the accident he was on his way back to Milwaukee. Mrs. Wesenberg resided at Neenah and on Sunday evening had driven a family friend to Waukesha, and the accident happened on her return trip to Neenah. Thus, Simon was driving south and Mrs. Wesenberg north. The Simon vehicle was a new two-door Ford Fairlane convertible while Mrs. Wesenberg was driving a two-door Chevrolet sedan.

Simon testified as follows: He first saw the headlights of the Wesenberg car when it was about a mile distant. He

was then traveling in the southbound traffic lane at a speed of 55 miles per hour. When the gap between the two vehicles had narrowed to about 500 feet the Wesenberg car began to "creep" into his lane of traffic until it had invaded about two feet of the west traffic lane. To avoid a collision Simon first turned his car to the left and when it was about three feet east of the center line he then turned his car sharply to the right and headed for the west ditch. He also applied his brakes but not hard enough to lock them. The front of the Wesenberg car then struck the left rear side of his car.

One Larson was operating a car in a northerly direction and was a considerable distance to the south and rear of the Wesenberg car when the accident occurred. Larson was asked these questions and gave these answers thereto:

"*Q.* And which one had been in front of you? *A.* The Chevy; Mrs. Wesenberg's car.

"*Q.* And what did her car do immediately before the collision? *A.* She applied the brakes; I would say roughly three times the brake lights went on and off as she veered to the right, but not off the highway, and then came back toward the center line, and at that time the impact happened. She did not leave the highway."

A county traffic officer arrived on the scene and investigated the accident before either vehicle had been moved. He found no evidence of any skid marks or debris on the pavement. The Simon car was facing westerly with its front end in the west ditch while the Wesenberg vehicle was in its own traffic lane facing southwesterly and about 69 feet to the north and east of the Simon car. This officer placed the point of impact to the Simon car just to the rear of the left rear wheel. Such point of impact was also corroborated by the garageman who repaired the Simon car.

Mrs. Wesenberg's version of the accident as testified to by her at the trial conflicted with that given by her on her prior adverse examination. On her adverse examination she had testified that she was confronted by the headlights of two automobiles approaching her which were abreast of each other, thus placing the Simon car in the east traffic lane passing the other car. The testimony of the two impartial eyewitnesses to the accident, Larson and Sattler, is directly contrary to this. Both testified that Simon had neither passed another car at the time the accident occurred nor shortly prior thereto. Sattler at the time was driving a car in a southerly direction and testified that his car was from 800 to 1,000 feet to the north and rear of the Simon automobile at the time the impact occurred. He further stated that Simon had passed the Sattler car at a point about three miles north of the point of collision. At the trial Mrs. Wesenberg testified that she saw the headlights of two cars approaching from the opposite direction, and that the set which was in her traffic lane was possibly two car lengths ahead of the other.

Mrs. Wesenberg estimated her own speed at from 45 to 50 miles per hour. She testified that she did not at first apply her brakes because she thought the Simon car would get back in its own lane. Then she stated she turned to the right so that her right front wheel was on the gravel shoulder at the time of impact. However, Sattler testified that the Simon car appeared to make a sharp turn to the right and that when the impact occurred the center of the Simon car was in the center of the west traffic lane. If this be true, then at the time of impact approximately the rear two feet of the Simon car would have been in the east traffic lane. This is also consistent with Larson's testimony that the collision occurred near the center line of the pavement.

After the accident Sattler talked to Mrs. Wesenberg and he testified that she exclaimed, "My God, where did he [Simon] come from?" This gives rise to the inference that she had not observed the Simon car until the instant of impact.

## Mrs. Wesenberg's Negligence.

On the basis of the foregoing summary of the evidence it is apparent that there was ample credible evidence to sustain the jury's findings that Mrs. Wesenberg was causally negligent both as to lookout and management and control.

The jury could well conclude that she did not keep a proper lookout. Her testimony on her adverse examination that she saw the headlights of two cars approaching her abreast is completely at variance with the testimony of the two disinterested witnesses. Furthermore, it gives rise to the inference that, if she did make any observation ahead of her immediately prior to the collision, it was a faulty one. Also her exclamation made to Sattler, "My God, where did he come from?" is evidence in itself that she was not keeping a proper lookout.

There is also ample evidence to sustain the jury's determination that Mrs. Wesenberg was causally negligent with respect to management and control. They had the right to believe that part of Simon's testimony that her car slowly crept toward the west traffic lane and that this was what caused Simon to first turn left and then right to avoid a collision. Such testimony, together with the foregoing evidence bearing on her failure to keep a proper lookout, would justify an inference that she may momentarily have succumbed to drowsiness and fallen asleep. Her later turning left after she had first turned right was also a mistake which cannot be justified under the emergency doctrine. This is because such emergency doctrine is not applicable where

negligent lookout contributes to produce the emergency. *Whirry v. Rural Mut. Casualty Ins. Co.* (1954), 267 Wis. 302, 308, 64 N. W. (2d) 841.

### Simon's Negligence.

We can perceive no basis for sustaining the appellant's contention that Simon was guilty of negligence as a matter of law as to lookout, speed, or management and control. According to his own testimony he observed everything that he was required to see from the time the vehicles were more than 500 feet apart until the collision occurred. There is no testimony fixing his speed in excess of 55 miles per hour, the legal speed limit applicable to night driving. The jury found he was negligent in crossing the center line of the pavement when he did, even though according to his testimony, he did so in order to avoid a collision. It would result in a duplicitous verdict if the jury were to have found him guilty of negligence with respect to management and control for the same conduct. While the jury could have determined that he should have applied his brakes harder than he did, they were not obliged to so find as a matter of law.

Appellant's brief places great stress upon admissions made by Simon that he had indulged in the drinking of intoxicating liquor after his arrival in Green Bay on Saturday and also on Sunday afternoon. However, the testimony is undisputed that he had nothing to drink after dinner Sunday evening which meal was served at 6:30 p. m. Thus approximately seven hours had elapsed between his last drink of liquor and the time of the accident. Because of this, the jury could well have considered such prior evidence of drinking immaterial in passing on Simon's alleged negligence.

### The Comparison of Negligence.

It is appellant's contention that the negligent crossing of the pavement center line by Simon as a matter of law constituted greater negligence than any negligence of Mrs. Wesenberg found by the jury. We disagree. The jury could well have determined that the apparent loss of control of her car by Mrs. Wesenberg, thereby causing it to slowly veer as if it were about to enter Simon's traffic lane, was the original negligent act which precipitated the accident.

The impression gained from reading the record in this case is that this accident would not have happened unless one or the other of the two drivers had partially succumbed to sleepiness. As we interpret the verdict, the jury determined that it was Mrs. Wesenberg, and not Simon, who had so succumbed. The finding that Mrs. Wesenberg was negligent as to lookout, and Simon was not, strongly tends to support such an interpretation.

*By the Court.*—Judgment affirmed.